# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ABRAHAM FRAENKEL, *et al.*, | |
| Plaintiffs, | Case No.: 24-cv-4484 (RA) (RWL) |
| v. | |
| STANDARD CHARTERED BANK, | |
| Defendant. | |
| SHMUEL BRAUNER, *et al.*, | |
| Plaintiffs, | Case No.: 24-cv-5788 (RA) (RWL) |
| v. | |
| STANDARD CHARTERED BANK, | |
| Defendant. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Adam J. Goldstein
Ryan R. Sparacino (*pro hac vice*)
Jacob R. Loshin (*pro hac vice* forthcoming)
Matthew J. Fisher (*pro hac vice*)
Stacey Wilson (*pro hac vice* forthcoming)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
Tel: 202.629.3530
adam.goldstein@sparacinopllc.com
ryan.sparacino@sparacinopllc.com
jacob.loshin@sparacinopllc.com
matt.fisher@sparacinopllc.com
stacey.wilson@sparacinopllc.com

*Counsel for Plaintiffs*

January 14, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 4

    A.    JASTA's Legal Framework ................................................................4

    B.    Plaintiffs' Allegations.......................................................................5

        1.    The Terrorism Machine................................................... 6

        2.    The Numerous Warnings to SCB ............................................... 9

        3.    SCB's Criminal Support to the Terrorist Sponsors ................................... 10

        4.    The Terrorist Attacks.................................................................. 12

LEGAL STANDARD ....................................................................................................... 13

ARGUMENT ................................................................................................................... 13

I.    Plaintiffs State An Aiding-Abetting Claim Under JASTA.................................13

    A.    Plaintiffs Plausibly Allege SCB's General Awareness That It Was Playing a Role in Financing Hezbollah, Hamas, and PIJ Terrorist Attacks...........................14

    B.    Plaintiffs Plausibly Allege SCB's Knowing and Substantial Assistance. ..............22

II.    All Of Plaintiffs' Claims Are Timely. ................................................................28

III.    SCB Is Subject To Personal Jurisdiction..........................................................30

CONCLUSION................................................................................................................ 30

# TABLE OF AUTHORITIES

## Cases

*Arista Recs., LLC v. Doe 3*,
   604 F.3d 110 (2d Cir. 2010) ................................................ 13

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................ 13

*Bartlett v. Société Générale de Banque Au Liban SAL*,
   2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ........................... 25, 30

*Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*,
   522 U.S. 192, 201 (1997) .................................................. 28

*Bernhardt v. Islamic Republic of Iran*,
   47 F.4th 856 (D.C. Cir. 2022) ......................................... 17, 23

*Bonacasa v. Standard Chartered PLC*,
   2023 WL 2390718 (S.D.N.Y. Mar. 7, 2023) .............................. 26

*Bonacasa v. Standard Chartered PLC*,
   2023 WL 7110774 (S.D.N.Y. Oct. 27, 2023) ............................. 22

*Cabrera v. Black & Veatch Special Proj. Corp.*,
   2024 WL 1435146 (D.D.C. Mar. 28, 2024) .............................. 28

*Dos Santos v. Assurant, Inc.*,
   625 F. Supp. 3d 121 (S.D.N.Y. 2022) .................................. 29

*Gucci Am., Inc. v. Weixing Li*,
   135 F. Supp. 3d 87 (S.D.N.Y. 2015) ................................... 30

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ..................................... *passim*

*Honickman v. BLOM Bank SAL*,
   6 F.4th 487 (2d Cir. 2021) ......................................... 14, 17

*In re Penn Cent. Transp. Co.*,
   944 F.2d 164 (3d Cir. 1991) .......................................... 28

*Kaplan v. Lebanese Canadian Bank, SAL*,
   999 F.3d 842 (2d Cir. 2021) ....................................... *passim*

*King v. Habib Bank Ltd.*,
   2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022) ........................... 26

*King v. Habib Bank Ltd.*,
    2023 WL 8355359 (S.D.N.Y. Dec. 1, 2023) ........................................ 22

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ........................................................ 13, 30

*Owens v. Republic of Sudan*,
    864 F.3d 751 (D.C. Cir. 2017) ............................................................ 26

*SEC v. Power*,
    525 F. Supp. 2d 415 (S.D.N.Y. 2007) ................................................ 29

*Siegel v. HSBC North Am. Holdings*,
    933 F.3d 217 (2d Cir. 2019) ........................................................ 17, 26

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023) ............................................................... *passim*

*United States v. George*,
    779 F.3d 113 (2d Cir. 2015) ............................................................. 16

*United States v. Sunoco, Inc.*,
    644 F. Supp. 2d 566 (E.D. Pa. 2009) ................................................ 28

*Wynder v. McMahon*,
    360 F.3d 73 (2d Cir. 2004) ................................................................ 6

*Zobay v. MTN Group Ltd.*,
    695 F. Supp. 3d 301 (E.D.N.Y. 2023) ............................................ *passim*

### Statutes

18 U.S.C. § 2333(a) ............................................................................... 1

18 U.S.C. § 2333(d) ............................................................................... 5

18 U.S.C. § 2335(a) ............................................................................. 28

Justice Against Sponsors of Terrorism Act,
    Pub. L. No. 114-222, 130 Stat. 852 (2016) ................................... *passim*

Sudan Claims Resolution Act,
    Pub. L. No. 116-260, 134 Stat. 3294 (2020) ....................................... 3

**Other Authorities**

H.R. Rep. No. 115-858 (2018) ............................................................................... 4

Op. and Order, ECF 157, *United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank*, No. 18-cv-11117 (S.D.N.Y. Nov. 11, 2024) ................................... 21

S. Rep. No. 102-342 (1992) ................................................................................. 4

# INTRODUCTION

These are actions against Standard Chartered Bank ("SCB") under the Anti-Terrorism Act ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), for aiding and abetting terrorist attacks between 2010 and 2019 in Israel and Iraq. 18 U.S.C. 2333(a); Pub. L. No. 114-222, 130 Stat. 852 (2016). Plaintiffs are 90 Americans who were killed or injured, or had family members killed or injured, in those attacks. ¶¶975-1165.[1] Plaintiffs include a family traveling with their baby daughter, a teenager out with friends, and others going about their lives when they were brutally kidnapped, shot, stabbed, rammed with vehicles, shattered by rockets, or blasted by a roadside bomb. *Id*. These attacks were committed, planned, or authorized by Foreign Terrorist Organizations ("FTOs") Hezbollah, Hamas, and/or Palestinian Islamic Jihad ("PIJ"). *Id*. But all the attacks had one thing in common: They were orchestrated and made possible by the most systematic and organized terrorist enterprise the world has ever known. ¶¶975-76, 986-87, 997-98, 1012, 1032-33, 1046, 1054-55, 1082, 1102, 1113, 1122, 1140-41, 1156.

Calling itself the "Axis of Resistance," this enterprise sought over many years to export Iran's Islamic Revolution and to drive the United States from the Middle East by killing Americans and their allies wherever they could be found. ¶¶49-283. At the center of the enterprise were elements of the Iranian regime—including the Islamic Revolutionary Guard Corps ("IRGC"), the Foundation for the Oppressed, and key individuals associated with Supreme Leader Ayatollah Khamenei—who systematically converted commercial activity in certain sectors of Iran's economy into anti-American terrorist attacks. ¶¶94-215, 424-71. Through these conduits, which Plaintiffs collectively call Iran's Terrorist Sponsors, commercial entities became fronts for terrorist

---

[1] Plaintiffs' Amended Complaint (*Fraenkel* ECF 34; *Brauner* ECF 25) ("Complaint") is cited as ¶_. SCB's memorandum in support of its motion to dismiss is cited as MTD __.

financing, and a fixed and substantial portion of the proceeds from their commercial activities was used to fund, source, and provide the weapons, training, logistics, incentive payments, and other resources the FTOs needed to commit terrorist attacks. ¶¶827-969. Each attack on Plaintiffs depended on this highly efficient terrorism machine operating out of Iran.

The attacks that killed or injured Plaintiffs had something else in common too: SCB facilitated all of them. SCB knowingly fed and maintained the terrorism machine by serving fronts that it knew the Terrorist Sponsors used to fund those attacks. Throughout the relevant period, SCB received dozens of specific, direct, and increasingly dire warnings from the U.S. government and others, making clear that transactions with certain types of customers in Iran would reliably fund attacks like those that killed or injured Plaintiffs (¶¶720-805); SCB knew that Iran was subject to comprehensive sanctions, largely to starve the Terrorist Sponsors of the funds they used to support terrorist attacks by their FTO proxies (¶¶489-502); and SCB knew that critical counterterrorism controls depended on banks sending accurate payment messages through the U.S. financial system (¶¶503-24). SCB's own U.S. compliance staff voiced similar warnings, fearing "*very serious or even catastrophic reputational damage*" to the bank if they were ignored. ¶552. Yet SCB prioritized profits over American lives. ¶3. The response to SCB's U.S. compliance staff from one of its most senior UK-based executives says it all: "You fucking Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians." ¶552. And so SCB did, with eyes wide open.

By serving fronts or agents of Iran's Terrorist Sponsors, SCB enabled billions of dollars to flow through the U.S. financial system and into the terrorism machine. ¶¶525-710. All the while, SCB went to extraordinary lengths to maintain the machine by helping the Terrorist Sponsors thwart U.S. counterterrorism controls—stripping identifying information from payment messages,

coaching customers on how to evade scrutiny, falsifying customer documents, and lying to the U.S. government. *Id*. SCB's misconduct was a long-running criminal scheme, as SCB acknowledged in deferred prosecution agreements with the Department of Justice and settlements with regulators. ¶¶5, 11. But it was more than a regulatory violation. SCB provided vital assistance to Iran's Terrorist Sponsors knowing that their profits would flow to the FTOs that killed or injured Plaintiffs, thereby aiding and abetting the attacks that caused Plaintiffs' injuries.

It is the "long-standing policy of the United States that civil lawsuits against those who support, aid and abet, and provide material support for international terrorism serve the national security interests of the United States by deterring the sponsorship of terrorism and by advancing interests of justice, transparency, and accountability." Sudan Claims Resolution Act, Pub. L. No. 116-260, div. FF, tit. XVII, § 1706(a)(1), 134 Stat. 3294 (2020). And JASTA's express objective is to "provide civil litigants with the broadest possible basis" to seek relief against those who "have provided material support, directly or indirectly," to terrorist organizations. JASTA § 2(b). JASTA entitles the Plaintiffs to recover against SCB for their injuries.

Plaintiffs amply clear the bar for pleading a JASTA aiding-abetting claim. At its core, SCB's motion pretends that liability is only for those who transacted *directly* with an FTO. SCB repeatedly emphasizes that none of its direct customers was an FTO (MTD 1, 2, 4, 5, 7, 8, 9, 11, 12, 18, 21, 23, 24) and posits that this creates a "complete disconnect between any SCB-linked banking transaction and any of the Attacks that harmed Plaintiffs" (*Id.* 2). However, SCB's core argument is foreclosed by *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021), in which the Second Circuit held that such arguments "disregard[] Congress's instruction that JASTA is to be read broadly and to reach persons who aid and abet international terrorism 'directly or indirectly,'" reaching a defendant "even where his relevant substantial assistance was given to

3

an intermediary." *Id*. at 855-56 (quoting JASTA § 2(b)). Under the proper legal standard, the "touchstone" for aiding-abetting liability is "foreseeability," *Zobay v. MTN Group Ltd*., 695 F. Supp. 3d 301, 342 (E.D.N.Y. 2023), and "remote support can still constitute aiding and abetting in the right case" where the terrorist attack is "a foreseeable risk" of the defendant's misconduct, *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 496 (2023) (quoting *Halberstam v. Welch*, 705 F.2d 472, 488 (D.C. Cir. 1983)).

This is the right case. Blithely waving away most of the Complaint as "extraneous allegations" (MTD 1), SCB simply ignores its detailed explication of how the attacks that injured Plaintiffs foreseeably resulted from SCB's misconduct. ¶¶720-969. These well-pleaded allegations make this far more than a case about sanctions violations alone, and nothing like the sanctions-based ATA cases that other courts have dismissed. *Contra* MTD 1, 13, 21, 24.

SCB's remaining arguments fail. All of Plaintiffs' claims are timely because they accrued when Congress created JASTA's aiding-abetting cause of action in 2016, and they were brought within the ten years Congress provided for filing such claims. In any event, SCB's concealment of key misconduct until 2019 warrants equitable tolling. Further, SCB's use of its New York branch and other New York banks to flow U.S. dollars to Iran's Terrorist Sponsors easily establishes personal jurisdiction under this Circuit's established precedents.

## BACKGROUND

### A. JASTA's Legal Framework

Congress enacted the ATA to "provid[e] victims of terrorism with a remedy" and stop "the flow of money" to terrorists by imposing civil "liability at any point along the causal chain of terrorism." S. Rep. No. 102-342, at 22 (1992); *see also* H.R. Rep. No. 115-858, at 3-4 (2018) (authorizing civil litigation to "cut[] terrorists' financial lifelines").

In JASTA, Congress amended the ATA in 2016 to add a cause of action for "aiding and abetting." JASTA § 2(a)(4). In creating secondary liability, Congress found that companies that "contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism" should "reasonably anticipate being brought to court in the United States." *Id*. § 2(a)(6). Congress aimed to "provide civil litigants with the broadest possible basis . . . to seek relief against" entities that "directly or indirectly" assisted foreign terrorists. § 2(b).

JASTA's aiding-abetting cause of action is codified at 18 U.S.C. § 2333(d), which provides that in the event of "an injury arising from an act of international terrorism committed, planned, or authorized" by a designated FTO, "liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance." JASTA instructed that "the proper legal framework" for determining aiding-abetting liability is provided by *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), in which a woman was held civilly liable for aiding and abetting a murder committed during a burglary by her live-in companion. JASTA § 2(a)(5). She knew nothing about the murder, she did not lend any specific support to it, and her assistance to her companion was limited to clerical tasks like bookkeeping. 705 F.2d at 474-76, 488. She did not even "kn[ow] specifically that [her companion] was committing burglaries." *Id*. at 488. Nevertheless, she was liable for aiding and abetting the murder because "violence and killing" was a "foreseeable risk" of the broader enterprise involving "some type of personal property crime" that she assisted. *Id*.

### B.     Plaintiffs' Allegations

SCB ignores most of Plaintiffs' key allegations, which are corroborated by U.S. government reports, terrorism scholars, the Terrorist Sponsors' own statements, and dozens of

authoritative sources. Those allegations are summarized below.[2]

### 1. The Terrorism Machine

The essential context for understanding SCB's misconduct is the terrorism machine that Iran's Terrorist Sponsors created and operated through commercial fronts to systematically convert profits in certain sectors of Iran's economy into terrorist attacks on Americans. This terrorism machine had three significant elements.

*First*, the Terrorist Sponsors systematically captured certain sectors of Iran's economy, turning businesses in those sectors into fronts to finance terrorist attacks targeting Americans. ¶¶424-71. Between 2005 and 2009, the IRGC and Supreme Leader's Office ("SLO") orchestrated a monopolistic takeover of those sectors through numerous fronts. ¶425. The takeover was complete by 2009. ¶427. By 2011, a U.S. Defense Department assessment concluded, "[t]he IRGC has systematically militarized rather than privatized the Iranian economy." ¶425.

The IRGC and SLO takeover focused on key sectors, including communications, construction, import/export, and oil and gas. ¶¶431, 434. The latter was by far the IRGC's greatest economic instrument, contributing over 80% of its revenue. ¶435. In 2006, the IRGC loudly and publicly signaled its intention to monopolize the energy sector when the largest energy project in Iranian history, the South Pars oil field, was put under the control of IRGC front Khatam al-Anbiya ("KAA"). ¶¶436-38. From 2007 through 2011, the IRGC and SLO expanded and cemented their oil and gas monopoly. ¶¶439-42. In 2008, Ayatollah Khamenei publicly decreed that the Foundation for the Oppressed, an IRGC and SLO front, would be responsible for negotiating, collecting, and redistributing all funds associated with Iranian petroleum exports. ¶439. By Spring

---

[2] SCB's failure to grapple with Plaintiffs' principal allegations belies its half-hearted suggestion (at 10, 30) that the Complaint violates Rule 8. It does not. *See Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004) (rejecting a Rule 8 challenge where the "plaintiff's long submission does not overwhelm the defendants' ability to understand or mount a defense").

2011, Petro Nahad, another front openly under IRGC and SLO control, was established to consolidate and formalize the award of all oil and gas contracts. ¶¶441-45.

*Second*, several mechanisms ensured that revenue from commercial fronts would systematically be earmarked to support terrorist attacks. Throughout the relevant period, an official Logistics Policy Directive provided that whenever any unit of the IRGC or related organization signed a contract for civil projects (*e.g.*, its commercial monopolies), the proceeds from such projects were to be used for "strengthening of the [IRGC], and replacing [IRGC] equipment and machinery parts" needed for terrorist attacks. ¶¶396-98, 828. In addition, Ayatollah Khamenei mandated donations (*khums*), usually 20% on all IRGC transactions, to support his terrorist agenda. ¶¶829, 834, 925. This ensured that at least twenty cents of *every dollar*—including oil-related profits—flowed to support terrorist attacks. ¶¶830-33, 835. The Terrorist Sponsors even used auditors to maximize the flow of funds to terrorism. ¶¶836-38.

Moreover, specific individuals and entities responsible for orchestrating terrorist attacks were embedded in the commercial infrastructure, including Iran's oil and gas industry, leaving no doubt how commercial profits would be used. These included: (i) the Foundation for the Oppressed, a purported charitable foundation that in fact operated as a global operations front for Hezbollah, the IRGC's Qods Force, and other FTO proxies (¶¶141-75, 839-57); (ii) the SLO, which promoted the Ayatollah's terrorist agenda and supported attacks by Hezbollah, Hamas, and PIJ (¶¶108-40); (iii) the Khamenei Cell, the regime's chief terrorist leadership cell, which received *khums* and used them to finance attacks in which Khamenei Cell members such as Qods Force leader Qasem Soleimani and Hezbollah leader Hassan Nasrallah directly participated (¶¶292-95, 924-28); and (iv) Rostum Qasemi, a senior Qods Force leader, Khamenei Cell member, and

Specially Designated Global Terrorist ("SDGT") who also served as Minister of Oil and Director of KAA (¶¶293, 327, 334, 754, 778, 863-64).

As a result, *most* revenue from IRGC- and SLO-controlled sectors was used to support terrorism—a fact corroborated by numerous contemporaneous statements from government officials and terrorism scholars. ¶¶935-43. In the words of one Treasury official, "in Iran … any dollar they get … will be used for the IRGC before it's ever used for their people." ¶942.

*Third*, the support flowed to the IRGC's FTO proxies that committed terrorist attacks through multiple means. Funds from *khums* flowing to the Foundation for the Oppressed were distributed as martyr payments to the families of terrorists killed while executing attacks, bounty payments for successful attacks, salary payments to leaders of FTO proxies who oversaw attacks, operations payments to finance specific attacks, and logistics payments to build the infrastructure needed to carry out attacks. ¶850. These and other payments also flowed to proxies through the IRGC, the SLO, and Hezbollah. ¶¶892-97. These payments supercharged the terrorism machine by incentivizing and rewarding every terrorist act. ¶¶898-904. Further, Iranian oil was bartered to supply North Korean weapons, training, and attack-tunnel expertise to Hamas and PIJ. ¶¶907-12.

Iran's Terrorist Sponsors also oversaw the deployment of their assets in terrorist attacks, including those that killed or injured Plaintiffs. This occurred through joint cells, which fused Iran's Terrorist Sponsors together with Hezbollah, Hamas, and PIJ operatives for orchestrating attacks. These joint cells included the Khamenei Cell, which played a direct role in every attack against Plaintiffs (¶¶292-95); a Joint Logistics Cell, which coordinated the development, distribution, testing, and training of common terrorist weapons, tactics, and objectives (¶¶296-304); a Joint Hezbollah/Hamas Operations Cell, which played a role in Hamas kidnapping and rocket attacks (¶¶305-12); and a Joint Hezbollah/PIJ Operations Cell, which played a role in PIJ

rocket attacks (¶¶313-17). Through these joint cells, the individuals involved in financing terrorism from commercial transactions were also directly involved in planning, authorizing, and committing specific terrorist attacks. ¶¶921-28. SCB disputes none of these allegations.

## 2. The Numerous Warnings to SCB

SCB was well aware of the terrorism machine. SCB had an office on the ground *in Tehran* through May 2012, as well as a branch in nearby Dubai, from which the bank's employees and agents served Iranian customers and observed major developments in Iran firsthand. ¶¶483, 567-69. SCB closely monitored these developments because it viewed Iran as a promising business opportunity, when other Western banks would not tolerate the risks. ¶¶526, 572. SCB's own legal and compliance staff worried in a 2005 memo about a high-ranking Dubai employee becoming a "witness of fact for SCB's Iran Business." ¶571. As a global bank with customer due diligence (CDD) and anti-money laundering (AML) obligations, SCB actively monitored press reports and government statements relevant to its Iran business. ¶¶33, 480, 512. The Complaint catalogs many of them in detail, demonstrating SCB's real-time awareness of the terrorism machine as it took innocent lives in Israel, Iraq, and elsewhere. *See, e.g.*, ¶¶438-46, 449-50, 456-57, 464, 467, 470, 568-72, 721-34, 741-74, 777-804, 851-57, 861-64.

Yet that is only the beginning. SCB was also a prime target of an intense and unprecedented "financial pressure campaign" by the U.S. government to warn banks about the terrorism machine. ¶¶721, 725. One of the campaign's architects explained that the "cornerstone" of the campaign was to share information about "Iran's own conduct" to "spur the private sector to stop doing business with Iran," as "[n]o reputable bank would want to be caught" facilitating terrorism. ¶722. The warnings were detailed and direct: SCB received them through in-person meetings with senior government officials, as well as frequent government statements cataloged in the Complaint. ¶¶722-31, 750-74. The warnings were most intense during 2006-2008 and 2010-2011, before or

during SCB's most significant misconduct discussed below. *Id*. The warnings repeatedly emphasized that Iran's Terrorist Sponsors (particularly the IRGC): (1) were prolific funders and supporters of terrorist attacks against Americans; (2) facilitated terrorist attacks by fronts and proxies, including the IRGC's Qods Force, Hezbollah, Hamas, and PIJ; (3) systematically used a large share of the profits from ostensibly ordinary business transactions, especially in Iran's oil sector, to fund those attacks; (4) routinely used front companies and layered financial transactions to generate profits while evading sanctions; and (5) exercised such significant control and influence over key industries that any significant transaction with an Iranian front company in such industries, especially in the oil sector, would foreseeably fund terrorist attacks. ¶728.

### 3.  SCB's Criminal Support to the Terrorist Sponsors

From 2001 until at least 2015, SCB knowingly fed and maintained the terrorism machine by doing substantial business with obvious fronts for Iran's Terrorist Sponsors, in flagrant disregard of the comprehensive economic sanctions designed to starve that machine. Most remarkably, SCB facilitated *more than $150 million* in illegal transactions between November 2008 and June 2012 for a petrochemical front company (referred to in the Complaint as the "Iranian Petrochemical Company" a/k/a "Caspian Petrochemical FZE")—while simultaneously receiving at least 15 of the sharpest and most sustained U.S. government warnings about the IRGC's use of front companies in the petrochemical sector to fund terrorist attacks. ¶¶577-78, 753-71. Plaintiffs plausibly allege that SCB knew the Iranian Petrochemical Company was a front for Iran's Terrorist Sponsors: SCB's own due diligence files recorded that the company's nominal owner was an Iranian resident and that its ultimate beneficial owner was the Iranian Government even though the company purported to operate in the Dubai Airport Free Zone. ¶¶580-81. SCB knew from numerous U.S. government warnings that such a Dubai-based front for Iran in the oil and gas industry after 2008 had to be controlled by the IRGC, operating for the benefit of the Terrorist

Sponsors, and SCB's Dubai staff familiar with Iran must have known that the name used by the company's nominal owner, "Emamjomeh," referred to the imam appointed by Ayatollah Khamenei to lead Tehran's Friday prayers, in which the SLO regularly called for terrorist violence against Americans. ¶¶85, 96, 108-11, 136-40, 589-90.

SCB's misconduct went far beyond processing illegal transactions. In the battle between U.S. counterterrorism controls and the terrorists who sought to evade them, SCB sided with the terrorists. SCB falsified CDD documents to hide its customer's Iranian ownership (¶583); omitted or misrepresented information in SWIFT payment messages to mislead U.S. compliance personnel and U.S. correspondent banks about the nature of the transactions (¶584); lied to OFAC, claiming the IRGC front company had "no direct or indirect involvement with Iran" (¶586); and even advised the company to change its name to avoid detection on the eve of new sanctions (¶588). SCB knew this malfeasance would impede its own suspicious activity reporting for high-terrorism-risk transactions (¶¶503-18), as well as the U.S. government's monitoring of SWIFT payment messages through the Terrorist Finance Tracking Program (¶¶521-24). And SCB knew that impeding these counterterrorism controls was exactly what its Iranian customers wanted. As SCB's Iran office CEO admitted, he believed the Iranians' real concern was that the U.S. government would learn about the Iranians' illicit business dealings if the payments were transparent. ¶531.

SCB repeated a similar pattern multiple times with other customers who were closely associated with Iran's Terrorist Sponsors. In Gambia, SCB deeply enmeshed itself with SDGT Mohammad Bazzi, identified by the U.S. government as "one of Hizballah's most prominent financiers," and facilitated millions of dollars in transactions for his companies, including EAGL, through at least 2012. ¶¶654-77. Until at least 2010, SCB facilitated millions of dollars in transactions for Tajco Ltd., a company co-owned by the Tajideen brothers (Ali, Husayan, and

11

Kassim), who were well-known Hezbollah financiers, and who the U.S. government identified in 2009 as "run[ning] cover companies for Hizballah in Africa." ¶¶678-88.

SCB also processed approximately $240 million between November 2007 and August 2011 for two companies controlled by likely IRGC agent Mahmoud Reza Elyassi that were used as fronts for an Iranian money exchange that enabled sanctions evasion and money laundering. ¶¶594-610, 806-17. In addition, SCB processed at least $250 billion between 2001 and 2007 for three state-owned banks—the Central Bank of Iran (a/k/a Bank Markazi), Bank Saderat, and Bank Melli—which the U.S. government identified as instrumental to terrorist financing. ¶¶4, 349, 459-65, 525-59.

Throughout, SCB demonstrated a shocking determination to thwart U.S. counterterrorism controls—establishing an elaborate offshore scheme to strip information from SWIFT payment messages before they reached New York (¶¶532-51); coaching customers on how to structure their transactions to avoid raising suspicion (¶¶607-08); helping Iranian customers open new accounts to evade sanctions (¶¶603-04); launching a secret project to solicit new Iranian business between 2007 and 2010 in the face of the U.S. government's financial pressure campaign (¶562); lying to regulators about having ceased Iranian business in 2007 (¶¶560-66); misleading regulators about its sanctions compliance (¶¶689-705); and retaliating against whistleblowers (¶¶706-10). Indeed, those whistleblowers' allegations suggest that SCB's records will reveal even more misconduct. ¶¶12, 478, 487, 820.

### 4. The Terrorist Attacks

Plaintiffs' injuries arise from thirteen terrorist attacks in Iraq and Israel from 2010 to 2019, with most occurring between 2014 and 2016. ¶¶975-1165. The attacks involved kidnapping, rockets, vehicle ramming, shooting and/or stabbing, and a roadside bomb. For each attack, Plaintiffs allege the FTO that planned, authorized, or committed the attack and the assistance that

flowed from the Terrorist Sponsors, enabled by SCB. ¶¶921-928, 975-76, 986-87, 997-98, 1012, 1046, 1054-55, 1082, 1102, 1113, 1122, 1140-41, 1156.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint need only "contain sufficient factual matter, accepted as true," that would permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 663 (2009). This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility." *Id*. at 678. Because Plaintiffs "cannot be expected to plead a defendant's actual state of mind," they need only plead "general allegations as to a defendant's knowledge" and the "facts or events they claim give rise to an inference of knowledge." *Kaplan*, 999 F.3d at 864 (quotation omitted). Plaintiffs may also allege facts on information and belief where "facts are peculiarly within the possession and control of the defendant," or where "the belief is based on factual information that makes the inference of culpability plausible." *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). To survive a motion to dismiss under Rule 12(b)(2), Plaintiffs need only "make a prima facie showing that jurisdiction exists." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) (quotation omitted).

## ARGUMENT

## I. Plaintiffs State An Aiding-Abetting Claim Under JASTA.

SCB does not dispute that Plaintiffs' injuries arise from acts of international terrorism that were committed, planned, or authorized by FTOs. Instead, SCB focuses only on the requirements that an aider-abettor (1) "be generally aware of [its] role as part of an overall illegal or tortious activity at the time that [it] provides the assistance" and that it (2) "knowingly and substantially assist the principal violation." *Twitter*, 598 U.S. at 486 (quoting *Halberstam*, 705 F. 2d at 477). Plaintiffs plausibly allege both.

### A. Plaintiffs Plausibly Allege SCB's General Awareness That It Was Playing a Role in Financing Hezbollah, Hamas, and PIJ Terrorist Attacks.

Under the general awareness standard, the defendant "need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 496 (2d Cir. 2021). It is enough that defendants "knew they were playing *some sort of role* in" such an illegal or tortious enterprise. *Twitter*, 598 U.S. at 497 (emphasis added). Even the "passive" and "not culpable" role of social media companies in failing to remove ISIS content from their platforms (*see infra* 22), with a "highly attenuated" connection to any attack, was deemed sufficient to meet this standard in *Twitter*. *Id*. at 499-500. Plaintiffs easily satisfy the general awareness standard here by alleging that SCB knew it played a role in an illegal activity—the evasion of sanctions and other counterterrorism controls—from which the terrorist attacks that killed or injured Plaintiffs were foreseeable.

Plaintiffs plead the requisite "facts or events" that "give rise to an inference of" knowledge and foreseeability in extraordinary detail. *Kaplan*, 999 F.3d at 864. The most important events that made the terrorist attacks a foreseeable consequence of SCB's service to the Iranian Petrochemical Company were Ayatollah Khamenei's 2008 decree putting the Foundation for the Oppressed in charge of all funds associated with Iranian petroleum exports (¶439), and the Spring 2011 announcement that the SLO- and IRGC-controlled entity Petro Nahad would manage all oil and gas contracts (¶¶441-42). Through these official announcements, which were widely reported and of which SCB's Iran and Dubai staff would have been contemporaneously aware (¶443-46), the Iranian regime made clear that the entire oil and gas sector was under the control of the Terrorist Sponsors, who would use oil and gas profits to fund their FTO proxies' terrorist attacks.

At the same time, dozens of pointed U.S. government warnings reinforced that fact; indeed, SCB was a target of an unprecedented "financial pressure campaign" that made it impossible to ignore. ¶¶721-22. The core message of the warnings and statements was that doing business with customers like the Iranian Petrochemical Company would fund terrorist attacks by the IRGC's FTO proxies. Here are just a few examples:

- March 7, 2007 Treasury Under Secretary Levey Speech in Dubai: "The IRGC's control and influence in the Iranian economy is growing exponentially," and "[w]hen corporations do business with IRGC companies, they are doing business with organizations that are providing direct support to terrorism." ¶570.

- October 25, 2007 OFAC Fact Sheet: The IRGC "has numerous economic interests involving . . . the oil industry. . . . Through its companies, the IRGC is involved in a diverse array of activities, including petroleum production . . . ." At the same time, the IRGC "provides roughly $100 to $200 million in funding a year to Hizballah" and provides "lethal support in the form of weapons, training, funding, and guidance to Iraqi Shi'a militants [*e.g.*, Jaysh al-Mahdi] who target and kill Coalition and Iraqi forces." ¶750.

- February 10, 2010 OFAC Press Release: "The IRGC has . . . extensive economic interests in the defense production, construction, and oil industries, controlling billions of dollars of business. The profits from these activities are available to support the full range of the IRGC's illicit activities, including . . . support for terrorism." ¶754.

These and many similar warnings made clear to SCB that the Terrorist Sponsors had seized Iran's oil industry and weaponized it to fund attacks by Hezbollah and other FTO proxies. *See, e.g.*, ¶¶449-50, 753-74, 803. Terrorist attacks by the IRGC's FTO proxies were thus a foreseeable consequence of doing illegal business with an Iranian petrochemical company.

While not necessary to establish general awareness, Plaintiffs' allegations demonstrate not only that terrorist attacks were *foreseeable*, but also that they were in fact *foreseen by SCB* when it received the warnings. While the U.S. government was calling for extreme caution when dealing with potential Dubai-based front companies because many "were not easily identifiable as Iranian" (¶764), SCB hardly needed OFAC to designate the Iranian Petrochemical Company to know that it was in the heartland of the U.S. government's warnings. SCB's *own files* recorded that the

company was owned by the Iranian government. ¶580. And in light of the Terrorist Sponsors' well-publicized takeover of Iran's oil and gas industry, this meant that the company was controlled by the IRGC and a front for the Terrorist Sponsors, and that SCB knew it.

SCB's general awareness that it was playing a role in illegal activity was also confirmed by its *own employees*—who warned of "very serious or even catastrophic reputational damage" to the bank from its Iran business (¶552) and worried about a former Dubai executive becoming a "witness of fact" (¶571). Moreover, SCB repeatedly lied about and obfuscated its transactions with its Iran customers, further corroborating its general awareness that it was playing a role in illegal activity. *See, e.g., United States v. George*, 779 F.3d 113, 122 (2d Cir. 2015) (holding that a "factfinder could . . . infer consciousness of guilt" from a defendant's "obstruction" and "lying").

SCB's arguments to the contrary ignore or mischaracterize the Complaint. SCB accuses Plaintiffs of making "naked assertions of general awareness," while simply ignoring the detailed allegations—including numerous U.S. government warnings—that substantiate them. MTD 13. SCB also claims that the many warnings it received are "entirely irrelevant" because "[n]one connects SCB's customers to the FTOs that injured Plaintiffs." MTD 12. Not so. As shown above, many of these warnings connected SCB's Iranian oil business customers to the terrorism machine that flowed resources directly to Hezbollah, Hamas, and PIJ. ¶¶524, 729-30, 763, 772-73. SCB next suggests that many warnings were dated "*after* the relevant Attacks" or "*after* the provision of banking services." MTD 12. This, too, is false. The events and warnings cited above—and many more cited in the Complaint—pre-dated all or at least some of SCB's business with the Iranian Petrochemical Company (*i.e.*, 2009-12). ¶753. Indeed, the Complaint details "a clarion call" over the course of 2010 and 2011 by the U.S. government "consisting of at least fifteen events that warned SCB specifically about Iran's oil sector, its use of fronts, the dominance of the IRGC, and

its funding of terrorism," and explains that these warnings were "especially notable because they accompanied the most active period of SCB's assistance to the Iranian Petrochemical Company"— during which SCB processed 133 transactions amounting to *$140 million* through 2012. ¶753.

SCB also argues that its rampant violation of U.S. sanctions cannot "satisfy the general awareness requirement." MTD 13. This is a straw man, as Plaintiffs allege far more. In any event, SCB's willingness to flagrantly violate Iran sanctions surely demonstrates SCB's awareness that it was involved in "an overall illegal . . . activity," *Halberstam*, 705 F.2d at 477, and the undisputed fact that the counterterrorism sanctions SCB violated were "designed to prevent terrorist activity" (MTD 13) certainly supports the inference that SCB's knowing violations of those sanctions would foreseeably aid terrorist attacks.

This case is nothing like the cases SCB invokes. In *Honickman*, the bank's customers were three charities that "maintained a 'cover' in public" and whose support for Hamas was only revealed in a Treasury investigation announced *after* the relevant assistance. 6 F.4th at 502. That is a far cry from here, where SCB's own files identified SCB's customer as an Iranian front and its support for terrorist attacks by FTOs was obvious from contemporaneous events and warnings. Nor is this case like *Siegel v. HSBC North America Holdings*, where defendant HSBC's customer was a "large [Saudi] bank with vast operations" that was "believed by some" to have a few customers with links to terrorism, though not "most, or even many." 933 F.3d 217, 224 (2d Cir. 2019). Here, SCB's customers were known fronts for Iran's Terrorist Sponsors who had monopolized the oil and gas industry. Nor is this case like the out-of-Circuit case *Bernhardt v. Islamic Republic of Iran*, where sparse allegations of Iran's general support for terrorism did not demonstrate HSBC's awareness that transacting with two Iranian banks engaged in many "legitimate" activities would support attacks in Afghanistan by al-Qaeda. 47 F.4th 856, 868 (D.C.

Cir. 2022). In these cases, where the relevant terrorist-linked customer was a needle in a haystack at a large bank that had a correspondent banking relationship with HSBC, HSBC could not be aware that the specific transactions it conducted for the other bank would involve its terrorist-linked customer. But here, there was no haystack. SCB knew that the Terrorist Sponsors had systematically monopolized Iran's oil and gas sector (¶¶435-51); SCB knew that the Iranian Petrochemical Company was a government-owned business operating in that sector, making it a front for the Terrorist Sponsors (¶¶577-93); and SCB knew that the Terrorist Sponsors directed a substantial part of the profits from fronts like the Iranian Petrochemical Company to fund terrorist attacks by the specific FTOs who attacked Plaintiffs (¶¶740-804).

To be sure, as SCB argues, "sovereign nations invariably maintain legitimate government activities," and Iran "has many legitimate agencies, operations, and programs to fund." MTD 15. Plaintiffs agree that not every economic activity in Iran was weaponized to fund terrorist attacks. *See* ¶433. But by 2009, Iran's oil and gas sector comprehensively was—and that made all the difference for the foreseeability of terrorist attacks funded by services to Iranian companies in that sector. Because the Terrorist Sponsors controlled that industry, businesses like the Iranian Petrochemical Company were "so closely intertwined" with the Terrorist Sponsors' violent activities that they were little more than commercial fronts for terrorism. *Kaplan*, 999 F.3d at 860. In that crucial respect, this case is much closer to *Kaplan* and *Zobay* than *Siegel*, *Bernhardt*, and the other cases SCB cites. In *Kaplan*, the Second Circuit reversed the dismissal of a JASTA claim against a bank where the bank's customers were entities affiliated with Hezbollah and public sources identified them as such. Indeed, this case is easier than *Kaplan* because the only illegal activity of which the bank was generally aware was its customers' support for terrorism. 999 F.3d at 849-51. Here, SCB was obviously aware of its own culpable and criminal role in its customer's

18

illegal activity because it was violating sanctions and U.S. counterterrorism controls on its customer's behalf, leaving only the question of whether terrorist attacks were foreseeable. In *Zobay*, plaintiffs plausibly alleged general awareness based on "public sources connecting the IRGC to the telecommunications sector" and government warnings that "[w]here the IRGC entered a commercial market, one of its purposes was to facilitate illicit conduct," similar to the allegations here. 695 F. Supp. 3d at 337.

In short, acts that may be "neutral standing alone . . . must be evaluated in the context of the enterprise they aided," *Kaplan*, 999 F.3d at 865 (quoting *Halberstam*, 705 F.2d at 488), and as in *Kaplan*, the cases dismissing JASTA claims share "none of the context" of this one, *id*. at 859. Just as in *Halberstam* the context for Linda Hamilton's general awareness was her partner's string of property crimes, 705 F.2d at 488, and in *Kaplan* "the context [was] Hizbollah's policy and practice of engaging in terrorist raids" that it publicized, 999 F.3d at 865, the context here is the well-known workings of the IRGC's terrorism machine, the Terrorist Sponsors' systematic monopolization of Iran's entire oil and gas sector, and the U.S. government's many specific warnings that doing business with fronts like the Iranian Petrochemical Company would invariably finance terrorist attacks by the Terrorist Sponsors' FTO proxies.

To insist that known Iranian fronts like the Iranian Petrochemical Company were "seemingly legitimate entities" because they had not specifically been singled out for their terrorism ties in a sanctions designation or government report (MTD 13, 16, 17-18) misses the entire context. It would "defy common sense" to hold that knowledge of an entity's ties to an FTO "could be gained in no other way" than through a designation or warning about the specific entity. *Kaplan*, 999 F.3d at 864; *see also Zobay*, 695 F. Supp. 3d at 340. The U.S. government warnings often spoke in broad and general terms because the Terrorist Sponsors' monopolization and

weaponization of key Iranian industries occurred *en masse*. Where SCB had been warned that the Terrorist Sponsors had taken over Iran's oil and gas industry to fund terrorist attacks by its proxies, the inference was obvious that any Iranian customer in that sector would be implicated. And it makes no difference if SCB mistakenly doubted those warnings. The general awareness standard "does not require proof that the defendant had a specific intent," and "general awareness" connotes "something less than full, or fully focused, recognition." *Kaplan*, 999 F.3d at 863.

Plaintiffs' allegations about the Iranian Petrochemical Company are enough on their own to make plausible SCB's general awareness at the pleading stage. But Plaintiffs allege much more. With respect to Gambia, SCB's customer Mohammed Bazzi was designated as an SDGT in 2018 as "one of Hizballah's most prominent financiers," having funded Hezbollah "from his business activities" for "many years." ¶655. The Complaint catalogs several reports, of which SCB must have been aware (¶653), attesting to Bazzi's prominence as a Hezbollah financier before or during SCB's known transactions with Bazzi's company between 2008-12 (¶665). *See* ¶658 (articles from 2006 and 2007), ¶659 (2011 report on Bazzi buying weapons for Hezbollah), ¶673 (2011 Treasury press release and media reports). Plaintiffs plausibly allege that SCB would have investigated Bazzi and EAGL because of their leasing and naming-rights agreements. ¶670. SCB cannot persuasively claim ignorance of Bazzi's illicit activities: his companies operated out of the second floor of the *Standard Chartered Bank Building* in Gambia, where he hosted meetings with corrupt regime officials. ¶¶666-69.

The story is similar for Tajco Ltd., which was designated in December 2010 for financing Hezbollah, but whose owners were previously designated as SDGTs in 2009 for financing Hezbollah and whose connections to that FTO were "well known," according to news reports dating back at least to 2007, well before SCB's known transactions with Tajco. ¶¶682, 686. SCB's

knowledge can plausibly be inferred; it is a sophisticated multinational bank that knew a great deal about its high-value multinational clients (¶482) like the Tajideen Network (¶381), which did millions of dollars of business with multiple SCB branches, and at least *14 months* of transactions after the May 2009 designation (¶679). SCB's required CDD would have identified the Tajideens as Hezbollah financiers (¶687).

SCB suggests that the Gambia allegations lack merit because they come from a dismissed *qui tam* action. MTD 8, 18-19. But the whistleblowers there sought to dictate the outcome of a government enforcement action, and then alleged fraud in the denial of their request. The court merely found that they did not clear the high bar necessary to justify such extraordinary claims. Op. and Order, ECF 157 at 6, *United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank*, No. 18-cv-11117 (S.D.N.Y. Nov. 11, 2024). The court did not question the factual basis for the whistleblowers' sworn allegations that SCB transacted with Bazzi's company and Tajco—nor does SCB even contest the plausibility of those allegations here. The court's ruling thus has zero bearing here, and Plaintiffs have alleged far more than the whistleblowers by citing numerous sources corroborating SCB's knowledge that its customers were Hezbollah financiers.

Finally, with respect to Elyassi, SCB employees in Dubai knowingly assisted his large-scale, Iran-based sanctions evasion operation. ¶¶594-610, 806-17. Plaintiffs plausibly allege that Elyassi was an IRGC agent: the IRGC controlled major sanctions evasion activities; Elyassi tried to recruit the SCB employees by inviting them to visit Tehran; and these and other features of Elyassi's activities fit the profile of an IRGC agent. *Id*. And with respect to the Iranian banks, while every transaction may not necessarily have had an ascertainable connection to terrorist attacks, SCB's flagrant subversion of U.S. counterterrorism controls on behalf of the banks at such large scale over a long period of time speaks to SCB's corporate culture of maintaining close

relationships with Iranian customers and shows that SCB was well aware of its involvement in "an overall illegal . . . activity" when it helped Iran's Terrorist Sponsors and their fronts evade U.S. counterterrorism controls. *Halberstam*, 705 F.2d at 477.

**B. Plaintiffs Plausibly Allege SCB's Knowing and Substantial Assistance.**

The Complaint also plausibly alleges "knowing and substantial assistance." *Twitter*, 598 U.S. at 497. The Court in *Twitter* emphasized that the social media companies' "passive nonfeasance" in "fail[ing] to stop ISIS from using" their generally available platforms was insufficiently culpable. *Id.* at 500. The plaintiffs there also "fail[ed] to allege any definable nexus" between the use of defendants' social media platforms and the attack, where they did not allege that ISIS used the platforms to "plan or coordinate" the attack, or anything about "the amount of money" ISIS may have received in advertising revenue from the platforms. *Id.* at 503, 498, 505. Yet at the same time, the Court cautioned against "overstat[ing] the nexus that [JASTA] requires." *Id.* at 495. Aiding and abetting entails "a conscious, voluntary, and culpable participation in another's wrongdoing," but it "does not require the defendant to have known all particulars of the primary actor's plan." *Id.* at 493, 496 (quotation omitted). "As *Halberstam* makes clear, people who aid and abet a tort can be held liable for other torts that were a foreseeable risk of the intended tort." *Id.* at 496 (quotation omitted). While "a close nexus . . . might help establish" liability, *id.*, JASTA "does not always demand a strict nexus between the alleged assistance and the terrorist act," *id.* at 497. Even "more remote support can still constitute aiding and abetting in the right case." *Id.* at 496.

Like other recent JASTA cases that have survived motions to dismiss, this case is in a different universe from *Twitter*. *See Zobay*, 695 F. Supp. 3d at 345-51 (denying motion to dismiss); *King v. Habib Bank Ltd.*, 2023 WL 8355359 (S.D.N.Y. Dec. 1, 2023) (denying reconsideration); *Bonacasa v. Standard Chartered PLC*, 2023 WL 7110774 (S.D.N.Y. Oct. 27, 2023) (same).

*First*, SCB's misconduct on behalf of the Terrorist Sponsors was extremely culpable. Indeed, it was criminal. SCB illegally processed hundreds of transactions worth hundreds of millions of dollars through the U.S. financial system over the course of a decade in flagrant violation of sanctions designed to "protect [Americans] and other innocents around the world from terrorist attacks" by "restrict[ing] the flow of funds to terrorist groups." ¶524. Yet SCB's misconduct went well beyond even that. In its extraordinary efforts to help its Iranian clients— including fronts for Iran's Terrorist Sponsors—thwart U.S. counterterrorism controls, SCB falsified or omitted key information from SWIFT payment messages, falsified documents, lied to regulators, and advised clients on how to evade detection. ¶¶583, 584, 586, 588. SCB knew that these tactics would defeat U.S. government monitoring and reporting measures—which are some of "the most important and powerful tools" to "identify and locate the networks of terrorists and their supporters," and that play a "central role in identifying terrorist financing and the movement of terrorist funds through the financial system." ¶¶503-18, 521-24. The head of SCB's Iran office admitted that he knew Iranian customers did not want the U.S. government learning about their business dealings; and as explained above, SCB knew that these business dealings involved financing terrorist attacks. ¶531. SCB thus discarded its own legal obligations to restrict and monitor the flow of funds to terrorist attacks, and instead affirmatively assisted—and even encouraged (¶¶588, 601, 607-08)—the Terrorist Sponsors' evasion of counterterrorism controls. In doing so, SCB "associate[d] [itself] with the [Terrorist Sponsors'] venture" and "sought by [its] action to make" their attacks "succeed." *Twitter*, 598 U.S. at 490, 498 (quotation omitted).

SCB is wrong to suggest (at 21) that its purported "lack of intent to support terrorism" is dispositive. *Twitter* held no such thing, and Linda Hamilton had no intent to support Halberstam's murder. 598 U.S. at 485; *see also Bernhardt*, 47 F.4th at 868 n.12 ("There is no requirement of

specific intent, and a defendant does not have to 'wish[] to bring about' an act of terrorism" (quoting *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018))). SCB plucks that phrase from *Twitter* while ignoring its context, wherein the defendants' "passive nonfeasance" necessitated "a strong showing of assistance and scienter" because the "mere creation of [social media] platforms . . . is not culpable." 598 U.S. at 499-500; *see also* MTD 21 (citing *Amazon Servs. LLC v. United States Dep't of Agric.*, 109 F.4th 573, 582 (D.C. Cir. 2024), sharing a similar context where "the 'only affirmative conduct' . . . was offering and operating [Amazon's] fulfillment service"). The social media companies in *Twitter* broke no law; did not "treat[] ISIS any differently from anyone else"; had an "arm's length, passive, and largely indifferent" relationship with their users; and were "essentially . . . bystanders, watching passively" once they created their platforms. 598 U.S. at 500. SCB's misconduct could hardly be more different. SCB committed affirmative criminal acts intended to help fronts for the Terrorist Sponsors evade counterterrorism controls while facilitating the flow of funds to FTOs. This "affirmative misconduct" is a "crucial point of departure" from *Twitter*, and it places SCB on the opposite end of *Twitter*'s sliding scale of culpability. *Zobay*, 695 F. Supp. 3d at 346; *see also Twitter*, 598 U.S. at 491-92 (explaining that "less substantial assistance required more scienter . . . [a]nd, vice versa").

SCB plucks another phrase out of context when it argues that its sanctions violations did not "'induc[e], encourage[e], solicit[], or advis[e]'" the FTOs' terrorist acts, and incorrectly asserts that such conduct is "required to support a JASTA claim." MTD 21-22 (quoting *Twitter*, 598 U.S. at 490). *Twitter* required no such thing. It used the phrase SCB quotes when describing aiding-abetting liability under "criminal law," 598 U.S. at 490, while acknowledging "daylight between the rules for aiding and abetting in criminal and tort law," *id*. at 493. And in any event, *Twitter*'s use of the phrase was only illustrative, identifying some affirmative acts that criminal aiding-

abetting liability might "includ[e]"—hardly an exclusive list of what it requires. *Id*. at 490. Indeed, *Twitter* disavowed a strict adherence to the list in the very next sentence, explaining that "[r]egardless of the particulars, . . . it is clear that some culpable conduct is needed." *Id*.

*Second*, with respect to the nexus between SCB's misconduct and the terrorist attacks that killed or injured Plaintiffs, the difference here is also stark. While there were no well-pleaded allegations in *Twitter* that ISIS used the social media platforms to facilitate or fund the attack in question and no allegations in *Siegel* that any terrorists benefited from HSBC's banking services (*see* MTD 23), Plaintiffs here offer extraordinarily detailed allegations about how SCB's transactions contributed to the attacks, as explained above. Any "suggestion of an attenuated chain" between the defendant, the terrorist organizations, and the attacks "collapses" when the defendant has a terrorist front as a "business partner." *Zobay*, 695 F. Supp. 3d at 347; *see also Bartlett v. Société Générale de Banque Au Liban SAL*, 2020 WL 7089448, at *12 (E.D.N.Y. Nov. 25, 2020) (performing wire transfers for "Hezbollah's known front organizations" is substantial assistance that "plausibly bridge[s] th[e] gap" between "banking services and terrorist attacks"). By doing major business with a petrochemical company that SCB knew was a front for Iran's Terrorist Sponsors in an industry that the Terrorist Sponsors were systematically using to fund terrorist attacks, SCB made a vital contribution to the attacks. So too with SCB's other Iran customers and its Hezbollah-financier customers in Gambia.

Plaintiffs also detail how most of the funds from these transactions flowed ineluctably through specific mechanisms to the FTOs that committed the attacks (¶¶827-890), and how the funds were put to use in each of the attacks that killed or injured Plaintiffs (¶¶892-912). The very individuals who received oil profits from SCB's transactions participated in joint cells that were directly involved in the attacks. ¶¶921-28. The money funded attack incentive and reward

payments that encouraged the attacks, as well as the weapons, training, logistics, and tunnels that enabled each of them. ¶¶850, 893-94, 898-904, 907-12. The impact of the money was long-lasting, contributing to the construction of terror attack tunnels and the provision of training and other terrorist infrastructure that the FTOs used to commit attacks for many years. ¶¶929-34. All these allegations are well-founded; indeed, decades of U.S. government reports and findings have confirmed the tight nexus between the funds that flowed from Iran's oil and gas sector to the Terrorist Sponsors, and from there to the attacks that Hezbollah, Hamas, and PIJ subsequently committed in Israel and Iraq. ¶¶524, 729, 763, 772-73. SCB knowingly provided this critical cash flow for years, to the tune of hundreds of millions of dollars.

SCB incorrectly suggests that specific funds involved in its transactions must be traced to an attack. MTD 23. Because money "is fungible" and terrorists "can hardly be counted on to keep careful bookkeeping records," no court has required tracing every dollar through terrorist organizations to see whether it was the same dollar used in an attack. *Owens v. Republic of Sudan*, 864 F.3d 751, 799 (D.C. Cir. 2017) (quotation omitted), *vacated and remanded on other grounds*, *Opati v. Republic of Sudan*, 590 U.S. 418 (2020). Such a rule would eviscerate JASTA and countermand Congress's express objective of providing "the broadest possible basis . . . to seek relief against" those who contribute assistance "directly or indirectly" to foreign terrorists. § 2(b). Courts have rightly rejected JASTA claims where the nexus is entirely nonexistent or implausible. *See, e.g.*, *Twitter*, 598 U.S. at 501-02; *Siegel*, 933 F.3d at 225. But where the inference is plausible that money or other fungible aid "would be received" by an FTO, even "only indirectly," courts have required no more. *Kaplan*, 999 F.3d at 866; *see also, e.g.*, *Zobay*, 695 F. Supp. 3d at 346-48; *King v. Habib Bank Ltd.*, 2022 WL 4537849, at *8-10 (S.D.N.Y. Sept. 28, 2022); *Bonacasa v. Standard Chartered PLC*, 2023 WL 2390718, at *13-15 (S.D.N.Y. Mar. 7, 2023).

*Third*, to the extent there could be any doubt about the nexus here, SCB remains liable based on the systemic nature of its misconduct. *Twitter* recognized that a "defendant's role in an illicit enterprise can be so systemic that [it] is aiding and abetting every wrongful act committed by that enterprise," even those it does not even indirectly support. 598 U.S. at 496. In *Halberstam*, for example, "Linda Hamilton was not on the scene for the burglary of Halberstam's house and did not lend any specific support to Halberstam's murder." *Id*. at 495. But her "assistance to Welch was so intentional and systematic that she assisted each and every burglary" he committed; any time he "left the house to burglarize, he would have relied on Hamilton's assistance in laundering the stolen goods and transforming them into usable wealth." *Id*.

SCB's conduct was similar. As most banks exited the Iranian oil market (and often the Iranian market *writ large*) due to the Terrorist Sponsors' pervasive illicit behavior, SCB was one of the few banks willing to defy comprehensive sanctions to give Iran's Terrorist Sponsors and their fronts covert access to the U.S. financial system. ¶¶526-47, 562, 572-74. SCB conducted billions of dollars in illegal transactions over the course of a decade, while agreeing to falsify SWIFT payment messages to protect those customers from U.S. counterterrorism controls. *Id*. SCB set up an entire offshore operation to do so. ¶¶528-51. SCB thus laundered Iran's oil wealth for the Terrorist Sponsors in much the same way that Hamilton laundered Welch's stolen goods: SCB unquestionably conspired with fronts and agents for Iran's Terrorist Sponsors to evade sanctions and aided and abetted the IRGC's illegal efforts to free Iran's oil wealth from U.S. counterterrorism controls; and any time the Terrorist Sponsors needed U.S. dollars to arm and support their FTO proxies, they would have relied on SCB's willing assistance to keep the money flowing. The terrorist attacks that killed or injured Plaintiffs were a foreseeable consequence.

\* \* \*

*Twitter* warns against "inflexible codes," teaching a "common-law approach to aiding and abetting." *Id*. at 497, 493. Fundamentally, it seeks to distinguish between those who "'help[]' in the commission of a . . . tort" and those who were "innocent bystanders" or "gave only tangential assistance." *Id*. at 488. Liability should not reach persons who "passively watched a robbery," "ordinary merchants" whose "goods and services" were "misuse[d]," or banks merely "carrying out routine transactions." *Id*. at 489, 491. "Some level of blameworthiness is therefore ordinarily required." *Id*. at 489. But this case involves a paradigmatic example of affirmative misconduct "where the provider of routine services does so in an unusual way" that is highly culpable, and that has a plain and foreseeable nexus to the terrorist attacks that killed or injured Plaintiffs. *Id*. at 502. Plaintiffs deserve an opportunity to prove their plausible and well-supported allegations in court.

## II.      All Of Plaintiffs' Claims Are Timely.

SCB argues that claims based on three attacks are untimely because they were brought more than ten years after those attacks occurred, but SCB is wrong for two independent reasons.

**1.** SCB misreads JASTA's statute of limitations. Claims must be brought "within 10 years after the date the cause of action accrued." 18 U.S.C. § 2335(a). It is axiomatic that "a cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief." *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997). Courts have thus consistently recognized that "[a] claim deriving from a statute cannot accrue before the statute [creating the cause of action] has been enacted." *United States v. Sunoco, Inc.*, 644 F. Supp. 2d 566, 571 (E.D. Pa. 2009); *see also, e.g.*, *In re Penn Cent. Transp. Co.*, 944 F.2d 164, 168 (3d Cir. 1991) (same).

Therefore, Plaintiffs' JASTA claims could not have accrued before Congress enacted JASTA in 2016. *See Cabrera v. Black & Veatch Special Proj. Corp.*, 2024 WL 1435146, at *5 (D.D.C. Mar. 28, 2024) ("Because Plaintiffs could not have filed their secondary liability claims

until 2016, the ten-year statute of limitations on those claims has not run."). Moreover, JASTA was expressly retroactive to actions arising from injuries occurring on or after September 11, 2001. *See* JASTA § 7. Although SCB cites cases (MTD 26-27) for the unremarkable proposition that claims *existing at the time of an injury* typically accrue upon the injury's discovery, SCB cites no authority for its mystifying premise that a claim accrues before it exists. We are aware of none.

**2.** Even if JASTA claims could somehow accrue before they exist, the statute of limitations was equitably tolled until April 9, 2019, when the 2019 DPA first revealed that SCB had provided financial services to the Iranian Petrochemical Company and other fronts through at least 2014. ¶971. Moreover, SCB actively concealed its ongoing misconduct through an elaborate scheme of deception—lying to regulators, stripping identifying information from payment messages, and falsifying customer due diligence documents. ¶¶701-05, 972-74. Most significantly, SCB falsely represented in the 2012 resolution of its initial enforcement actions that it had "made the decision to exit the Iranian business" in October 2006 and "ended" its "U.S.-dollar clearing activity for all the Iranian banks" by March 2007. ¶¶560-61. But SCB's 2019 DPA revealed that SCB Dubai in fact continued providing banking services for Iranian customers until at least 2014. ¶¶562-66, 612.

"Tolling lasts so long as the fraud is effective," *Dos Santos v. Assurant, Inc.*, 625 F. Supp. 3d 121, 133 (S.D.N.Y. 2022) (quotation omitted), and allegations of affirmative acts of fraudulent concealment "suffice[] to satisfy the diligence requirement" for equitable tolling, *SEC v. Power*, 525 F. Supp. 2d 415, 426 (S.D.N.Y. 2007). SCB faults Plaintiffs for "waiting over twelve years" from its 2012 DPA and points to other actions against SCB filed by other plaintiffs in 2014 and 2017, but fails to mention the 2019 DPA that is at the heart of Plaintiffs' claims. MTD 27. Plaintiffs had no way of knowing about the misconduct that SCB successfully concealed until 2019, and the 2012 DPA *affirmatively misled* them to believe that SCB had come clean.

## III.     SCB Is Subject To Personal Jurisdiction.

SCB's jurisdiction argument lacks merit. Plaintiffs' allegations center around U.S. dollar transactions conducted for SCB's Iranian customers through the New York banking system via SCB's New York branch or another New York correspondent bank, as well as SCB's misleading New York and federal regulators and stripping wires to mislead its own New York compliance team and New York correspondent banks. ¶¶22, 28, 525, 536-37, 539-41, 556, 577-578, 612, 665, 679, 815. The core of SCB's misconduct was thus aimed directly at New York. These allegations, which SCB does not factually dispute, show that SCB "deliberately directed its conduct at the forum" and that the controversy is "related to [SCB's] in-forum conduct," thus establishing "minimum contacts." *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 97 (S.D.N.Y. 2015). The "selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs" suffices for personal jurisdiction under the ATA. *Licci*, 732 F.3d at 171; *see also Zobay*, 695 F. Supp. 3d at 331; *Bartlett*, 2020 WL 7089448 at *5 (collecting cases). SCB did exactly that. As SCB seemingly acknowledges (MTD 28-29), its jurisdiction argument simply repackages its nexus argument. But the argument fares no better the second time. Plaintiffs here allege that every U.S. dollar transaction SCB conducted for fronts for the Terrorist Sponsors contributed to the attacks that killed or injured Plaintiffs. Thus, as explained above, it is nothing like *Bernhardt*. Rather, as in *Licci*, the claim-related conduct—*i.e.*, the transactions that flowed U.S. dollars to Iran's Terrorist Sponsors—involved the forum.

## CONCLUSION

SCB's motion to dismiss should be denied.

Dated: January 14, 2025

Respectfully submitted,

*/s/ Adam J. Goldstein*

Adam J. Goldstein
Ryan R. Sparacino (*pro hac vice*)
Jacob R. Loshin (*pro hac vice* forthcoming)
Matthew J. Fisher (*pro hac vice*)
Stacey Wilson (*pro hac vice* forthcoming)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
Tel: 202.629.3530
adam.goldstein@sparacinopllc.com
ryan.sparacino@sparacinopllc.com
jacob.loshin@sparacinopllc.com
matt.fisher@sparacinopllc.com
stacey.wilson@sparacinopllc.com

*Counsel for Plaintiffs*